IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Elgin Jordan, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| -*vs*- | ) | No. 20-cv-4012 |
| | ) | |
| City of Chicago, Bryan Cox, Peter | ) | *(Judge Gottschall)* |
| Theodore, David Salgado, and | ) | |
| Rocco Pruger, | ) | |
| | ) | |
| | ) | |
| *Defendants*. | ) | |

## AMENDED COMPLAINT

Plaintiff, by counsel and pursuant to leave of court, files this amended complaint* and alleges as follows:

1.    This is a civil action arising under 42 U.S.C. § 1983. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343 and § 1367.

2.    Plaintiff Elgin Jordan is a resident of the Northern District of Illinois.

3.    Defendants Bryan Cox, Peter Theodore, David Salgado, and Rocco Pruger ("officer defendants") were, at all relevant times, acting under color of their offices as Chicago police officers.

4.    Defendant City of Chicago is an Illinois municipal corporation.

---

* Plaintiff repleads his *Monell* claim in paragraphs 13-22. The remaining paragraphs are identical to those contained in the original complaint.

5.    On March 31, 2015, the officer defendants arrested plaintiff in the area of West Roosevelt Road and South Springfield Avenue in Chicago

6.    At the time of plaintiff's arrest:

    a.    None of the officer defendants had a warrant authorizing the arrest of plaintiff;

    b.    None of the officer defendants believed that a warrant had been issued authorizing the arrest of plaintiff;

    c.    None of the officer defendants had observed plaintiff commit any offense; and

    d.    None of the officer defendants had received information from any source that plaintiff had committed an offense or was otherwise subject to arrest.

7.    After arresting plaintiff, the individual officer defendants conspired, confederated, and agreed to fabricate a false story in an attempt to justify the unlawful arrest, to cover-up their wrongdoing, and to cause plaintiff to be wrongfully detained and prosecuted.

8.    The false story fabricated by the individual officer defendants included their concocted claims that they had observed plaintiff selling drugs and that they had found drugs on plaintiff person.

9.     The acts of the individual officer defendants in furtherance of their scheme to frame plaintiff included the following:

a.  One or more of the officer defendants prepared official police reports containing the false story, and each of the other individual officer defendants failed to intervene to prevent the violation of plaintiff's rights;

b.  One or more of the officer defendants attested to the false story through the official police reports, and each of the other individual officer defendants failed to intervene to prevent the violation of plaintiff's rights; and

c.  One or more of the officer defendants communicated the false story to prosecutors, and each of the other individual officer defendants failed to intervene to prevent the violation of plaintiff's rights.

10.     As a result of the above-described wrongful acts, plaintiff was deprived of his liberty while a pre-trial detainee, convicted of a felony, and then confined in the penitentiary for several years.

11.     The Illinois Appellate Court reversed plaintiff's conviction on August 26, 2019.

12. On December 13, 2019, the prosecutor dropped all charges against plaintiff.

13. At all relevant times, the Chicago Police Department maintained official policies, practices, and customs that facilitated, encouraged, and condoned the officer defendants' misconduct.

14. Specifically, defendant City of Chicago has known and encouraged a "code of silence" among its police officers that required police officers to remain silent about police misconduct. An officer who violated the code of silence would be severely penalized by the Department.

15. At all relevant times, police officers were trained at the Chicago Police Academy not to break the code of silence. Officers were instructed that "Blue is Blue. You stick together. If something occurs on the street that you don't think is proper, you go with the flow. And after that situation, if you have an issue with that officer or what happened, you can confront them. If you don't feel comfortable working with them anymore, you can go to the watch commander and request a new partner. But you never break the code of silence."

16. This code of silence facilitated, encouraged, and enabled the individual officer defendants to engage in misconduct for many years,

knowing that their fellow officers would cover for them and help conceal their wrongdoing.

17.     In the case of *Obrycka v. City of Chicago et al.*, No. 07-cv-2372 (N.D. Ill.), a federal jury found that as of February 2007, "the City [of Chicago] had a widespread custom and/or practice of failing to investigate and/or discipline its officers and/or code of silence."

18.     In December 2015, Chicago Mayor Rahm Emanuel acknowledged the continued existence of the code of silence within the Chicago Police Department; Emanuel, speaking in his capacity as Mayor, admitted that the code of silence leads to a culture where extreme acts of abuse are tolerated.

19.     In April 2016, the City's Police Accountability Task Force found that the code of silence "is institutionalized and reinforced by CPD rules and policies that are also baked into the labor agreements between the various police unions and the City."

20.     As determined by the United States Department of Justice in its official report entitled "Investigation of the Chicago Police Department," January 13, 2017, at 75:

a. "One way to cover up police misconduct is when officers affirmatively lie about it or intentionally omit material facts."

b. "The Mayor has acknowledged that a 'code of silence' exists within CPD, and his opinion is shared by current officers and former high-level CPD officials interviewed during our investigation."

c. "Indeed, in an interview made public in December 2016, the President of the police officer's union admitted to such a code of silence within CPD, saying 'there's a code of silence everywhere, everybody has it . . . so why would the [Chicago Police] be any different.'"

21. The United States Department of Justice concluded that "a code of silence exists, and officers and community members know it." Report at 75.

22. On March 29, 2019, then-Chicago Police Superintendent Eddie Johnson publicly acknowledged the code of silence, stating that some Chicago police officers "look the other way" when they observe misconduct by other Chicago police officers.

23. In October 2020, Chicago Police Superintendent David Brown acknowledged in public comments that the code of silence continues to exist.

24.     The same code of silence in place during the time period at issue in the *Obrycka* case and recognized by the Mayor, Superintendent Johnson, Superintendent Brown, the Task Force, and the Department of Justice was also in place when plaintiff suffered the wrongful arrest, detention, and prosecution described above.

25.     Before engineering plaintiff's above-described wrongful arrest, detention, and prosecution, the officer defendants had been the subject of numerous formal complaints of official misconduct:

        a.  Cox had been the subject of at least 22 complaints;

        b.  Pruger had been the subject of at least 23 complaints;

        c.  Salgado had been the subject of at least 21 complaints;

        d.  Theodore had been the subject of at least 14 complaints;

26.     Despite these many allegations of wrongdoing, and as the direct and proximate result of the code of silence none of these allegations of wrongdoing resulted in discipline sufficient to deter the continued wrongdoing.

27.     By maintaining its code of silence, the City caused its officers to believe that they could engage in misconduct with impunity because their actions would never be thoroughly scrutinized.

28.    The code of silence gave defendants Cox, Pruger, Salgado, and Theodore comfort and a sense that they could violate plaintiff's rights and not be disciplined.

29.    The code of silence emboldened defendants Cox, Pruger, Salgado, and Theodore to frame plaintiff.

30.    The code of silence provided defendants Cox, Pruger, Salgado, and Theodore with good reason to believe that they would effectively be immune from any sanction for their wrongdoing.

31.    The code of silence encourages Chicago police officers to frame innocent persons because the officers know they will not be meaningfully disciplined, and it encouraged defendants Cox, Pruger, Salgado, and Theodore to frame plaintiff.

32.    As a direct and proximate result of the City's code of silence, defendants Cox, Theodore, Salgado concocted the false story and fabricated evidence against plaintiff.

33.    As a result of the foregoing, plaintiff was deprived of rights secured by the Fourth and Fourteenth Amendments to the Constitution of the United States.

34.    As a supplemental state law claim against defendant City of Chicago only: as a result of the foregoing, plaintiff was subjected to a malicious prosecution under Illinois law.

35.    Plaintiff hereby demands trial by jury.

WHEREFORE, plaintiff requests that appropriate compensatory and punitive damages be awarded against the officer defendants, that appropriate compensatory damages only be awarded against defendant City of Chicago, and that fees and costs be taxed against all defendants.

/s/  Joel A. Flaxman
Joel A. Flaxman
ARDC No. 6292818
Kenneth N. Flaxman
200 S Michigan Ave Ste 201
Chicago, IL 60604-2430
(312) 427-3200
*Attorneys for Plaintiff*